Merle SIMON and Steven
A. Simon, Appellants

v.

**WYETH PHARMACEUTICALS,
INC., et al.**

**Merle Simon and Steven Simon,**

v.

**Wyeth Pharmaceuticals, Inc., et al.**

**Appeal of Pharmacia & Upjohn
Company, LLC, Appellants.**

Superior Court of Pennsylvania.

Argued Feb. 24, 2009.

Filed Dec. 31, 2009.

---

Howard J. Bashman, Willow Grove, for Simon, Merle and Stephen.

Emily J. Lawrence, Philadelphia and William Hoffman, Pro Hac Vice, Washington, DC, for Upjohn.

BEFORE: ORIE MELVIN, BOWES, and DONOHUE, JJ.

OPINION BY BOWES, J.:

¶ 1 This is an appeal by plaintiff-wife, Merle Simon,[1] a New Jersey resident, and a cross-appeal by defendant Pharmacia & Upjohn Company, LLC ("Upjohn"), a pharmaceutical company headquartered in New Jersey. For the reasons that follow, we reverse the trial court's grant of judgment notwithstanding the verdict and remand to the trial court for consideration of Upjohn's motion for a new trial.

¶ 2 On May 15, 2007, the jury returned its verdict in favor of Appellant and against Upjohn for $1.5 million on Appellant's claim that she had developed invasive breast cancer due to her use of hormone replacement prescription drugs ("hormone replacement therapy" or "HRT"), one of which was manufactured by Upjohn. Upjohn filed a motion for judgment notwithstanding the verdict ("JNOV") and alternatively, for a new trial. On September 7, 2007, the trial court granted Upjohn's motion for JNOV and deemed Upjohn's motion for a new trial, moot. This appeal by Appellant and cross-appeal by Upjohn followed.

¶ 3 The underlying facts are as follows. Appellant, who resides in New Jersey, be-

---

1. The jury found against plaintiff-husband, Steven Simon, in his claim for loss of consortium. He did not appeal that aspect of the verdict.

gan suffering from vasomotor symptoms such as night sweats and mood disturbances associated with the onset of menopause. N.T., 4/24/07 (afternoon), at 47, 60. Her gynecologist, Kenneth Dollinger, M.D., prescribed two HRT medications in 1992: Premarin, an estrogen manufactured by Wyeth, and Provera, a progestin manufactured by Upjohn. *Id.* at 48–49. Provera was prescribed for protection against endometrial cancer, a necessary protocol for women who have a uterus. As a result of taking these medications, Appellant experienced a reduction in menopausal symptoms. *Id.* at 61, 118.

¶ 4 Appellant testified that Dr. Dollinger eventually prescribed Prempro,[2] a newly available Wyeth product that combined estrogen and progestin into a single pill. *Id.* at 52–53. Dr. Dollinger never advised Appellant about a potential for increased risk of breast cancer due to the ingestion of these medications. *Id.* at 54. When Dr. Dollinger retired in 1994, Joanne Somers, M.D., assumed Appellant's gynecological care. *Id.* at 52. Dr. Somers either maintained Appellant on Prempro or first prescribed it[3] and also failed to tell Appellant of any possible increase in breast cancer risk as the result of taking the medication. *Id.* at 54–55. In 1998, Appellant changed doctors to Catherine Sladowski, M.D., who continued prescribing Prempro without any warning of increased breast cancer risk from its use. *Id.* at 56–57.

¶ 5 The trial court summarized the relationship and function of estrogen and progesterone in the female body from the expert testimony at trial.

The female body produces estrogen, the primary female sex hormone, in the initial stages of the monthly menstrual cycle. This production acts to form a new layer of tissue on the endometrial lining of the uterus. After ovulation occurs, the female body then produces progesterone in conjunction with estrogen. The progesterone converts the newly formed endometrial lining into a surface capable of supporting a fertilized egg. If fertilization has not occurred, the progesterone levels fall, which causes menstrual shedding, otherwise known as menstruation, and the cycle repeats itself.

When a woman reaches a stage in life when she is no longer fertile, she may develop common menopausal and/or post-menopause symptoms such as, hot flashes and flushes, insomnia, fatigue, irritability, and/or osteoporosis. These menopausal symptoms are attributed to the female body's reduced production of estrogen. To relieve these symptoms, physicians have prescribed, for decades, a[n] HRT which has estrogen as its primary component. Medical studies have shown, however, that unless a woman's uterus has been removed (such as by a hysterectomy) taking estrogen alone (*i.e.,* estrogen replacement therapy, or "ERT"), without opposing progesterone, can increase the risk of endometrial bleeding and cancer. This is because unopposed estrogen in a woman with a uterus causes endometrial hyperplasia, or extreme cell proliferation on the endometrial lining of the uterus which, in turn, is responsible for endometrial

2. Dr. Dollinger testified that he retired in 1994, which was before Prempro was released. Thus, there was a discrepancy regarding which of Appellant's doctors first prescribed Prempro. Prempro, however, was manufactured by Wyeth, which is not involved in this appeal.

3. Dr. Somers had no recollection of treating Appellant and had no medical records regarding her. Somers deposition at 3; R.R. at 5065A.

bleeding and an elevated risk of endometrial cancer.

In a combined HRT regimen, progestin is used to regulate and keep in check the cell growth caused by estrogen, much the same way that progesterone naturally does in the menstrual cycle. Since the potency of ordinary progesterone supplements is inconsistent from woman to woman, doctors instead prescribe progestin, a synthetically produced progesterone. Unlike ordinary progesterone supplements, the enhanced progestin when metabolized, delivers a predictable dose of progesterone in all women using the drug.

Trial Court Opinion, 12/26/07, at 3–4 (footnotes omitted); *see also* N.T., 4/16/07, at 46–47, 57; 4/19/07, at 44–46, 66–69; 5/1/07, at 66–68; and 5/8/07, at 27–29, 31–33, 35–38.

¶ 6 As noted *supra,* none of Appellant's three gynecologists who prescribed Premarin, Provera, or Prempro advised her that taking these hormones increased her chances of developing breast cancer. N.T., 4/24/07 (afternoon), at 53, 55, 57, 89. Even when Appellant was diagnosed with breast cancer, her physicians did not tell her that the HRT regimen maintained over the preceding ten years may have contributed to her contraction of that disease. N.T., 4/24/07 (afternoon), at 85, 89.

¶ 7 The trial court examined the product information provided for the hormone medications prescribed to Appellant.

Although Defendants were aware of research which found a correlation or at least suggested a correlation between the use of combined HRT and an increased breast cancer risk during the time period when Plaintiff-wife was using combined HRT, Defendants reacted to this information differently when labeling their respective products:

*Prempro* (Defendant Wyeth's combination drug) carried a label warning to patients explaining that some studies had found a link between estrogen and progestin HRT, and further encouraging its users to seek bi-yearly mammograms and to consult with their doctors immediately if a breast lump is suspected.

*Premarin* (Defendant Wyeth's estrogen) carried a label warning of potential cancer risks [4] associated only with ERT. (The drug labeling did not carry any warning regarding the use of Premarin in conjunction with a progestin.).

*Provera* (Defendant Upjohn's progestin) carried a label which explained that beagle dogs treated with progestin had developed breast malignancies, but the significance of that data with respect to humans had not been established.

Trial Court Opinion, 12/26/07, at 5–6 (footnotes omitted). The 1992 product information relating to beagles was as follows:

Beagle dogs treated with medroxyprogesterone acetate [the active ingredient in Provera] developed mammary nodules some of which were malignant. Although nodules occasionally appeared in control animals, they were intermittent in nature, whereas the nodules in the drug-treated animals were larger, more numerous, persistent, and there were some breast malignancies with metastases. **Their significance with respect to humans has not been established.**

*Physicians' Desk Reference,* "Provera," R.R. at 5231A (emphasis added). This

---

4. The risk identified by Premarin was for "endometrial carcinoma"; regarding breast cancer, product information noted that "a causal relationship is still unproven." *Physicians' Desk Reference,* "Premarin," 1992; defense exhibit 29.

labeling was provided for Provera from 1981 through 1996, and never changed. N.T., 4/19/07 (afternoon), at 106. Susan Parisian, M.D., a Board-certified anatomic and clinical pathologist who previously worked for the Food and Drug Administration ("FDA") and presently owns M.D. Assist, Inc., a consulting firm, testified that this explanation did not provide "a fair indication to physicians that any particular dosage of duration of [Provera] and Premarin would cause breast cancer in women." *Id.*

¶ 8 The 1996 product information for Prempro stated:

> The effect of added progestins on the risk of breast cancer is unknown, although a moderately increased risk in those taking combination estrogen/progestin therapy has been reported. Other studies have not shown this relationship. In a one year clinical trial of Prempro, ... 5 new cases of breast cancer were detected among 1377 women who received the combination treatments.... **The overall incidence of breast cancer in this clinical trial does not exceed that expected in the general population.**

R.R. at 5810A (emphasis added). Thus, both the product information and package inserts for Provera and Prempro failed to disclose to physicians or patients that taking progestins increased the risk of developing breast cancer.

¶ 9 Justin Victoria, a Wyeth employee who worked predominantly in regulatory affairs[5] from 1984 until 1995 and again from 1997 until 2000, testified that the *Physicians' Desk Reference* included product information contained in package inserts for individual drugs, beginning with the category, "Information for the Patient," and continuing to the end of the particular drug listing. N.T., 4/24/07 (morning), at 13–17, 26–27. He further explained that "the same words are not used in the patient labeling as are used in the physician labeling." *Id.* at 33. Mr. Victoria testified concerning the package inserts included with the drug Premarin beginning in 1992. As noted *supra*, Premarin was one of two drugs Dr. Dollinger prescribed for Appellant in 1992. Mr. Victoria testified that from 1992 until the end of 1998, "there was not a quantification of the breast cancer risk in the labeling." *Id.* at 32. Appellant testified that she read the package inserts included with all of the HRT medications. N.T., 4/24/07 (afternoon), at 119.

¶ 10 On July 9, 2002, the National Institutes of Health ("NIH") published the results of its Women's Health Initiative ("WHI") study, which had begun in 1991, in the *Journal of the American Medical Association.* That study had multiple components, one of which evaluated the use of progestin and estrogen in postmenopausal women, and its objective was "to assess the major health benefits and risks of the most commonly used combined hormone preparation in the United States." *Journal of the American Medical Association,* "Risks and Benefits of Estrogen Plus Progestin in Healthy Postmenopausal Women," at 321. Predominantly, the relevant component evaluated whether estrogen and progestin use decreased the incidence of cardiovascular dis-

---

5. In general, the regulatory affairs field is responsible for

> interaction of the company with government agencies as the Food and Drug Administration or the FDA, ... that prepares applications, sends them to the FDA, talks with the FDA, meets with the FDA ... when we are trying to get them approved at the very beginning, and then once the drugs are approved, our interactions [are] with the agencies following approval.

N.T., 5/1/07 (morning), at 13.

ease. It also assessed risks of hormone use, including the risk of developing breast cancer. The authors of the WHI study observed, "The WHI is the first randomized controlled trial to confirm that combined estrogen plus progestin does increase the risk of incident breast cancer and to quantify the degree of risk." *Id.* at 330. The authors also noted that the study was terminated three years earlier than its scheduled completion due to an unacceptably high incidence of invasive breast cancer among participants. *Id.* at 321; R.R. at 6134A–6143A. Thus, the results of the WHI study confirmed the existence of a significant causal link between HRT and breast cancer.

¶ 11 The trial court noted:

The National Institutes of Health (NIH) commissioned the Women's Health Initiative (WHI) study to examine whether HRT had any effect in decreasing the risk of cardiovascular disease in post-menopausal women. This study was prematurely terminated when an unusually high number of women in the experimental group taking HRT developed breast cancer. On July 9, 2002, the WHI released a preliminary report which proclaimed that long-term use of estrogen and progestin HRT increased breast cancer risk. The WHI's findings received massive media attention and resulted in a significant decline in the use of HRT.

As stated, in May 2002, approximately two (2) months before the WHI report was published, Plaintiff-wife was diagnosed with invasive lobular breast cancer. Plaintiff-wife testified that the first time she had any reason to suspect a causal connection between her usage of combined HRT and her breast cancer was when a friend mentioned a newspaper article which reported the findings of the WHI study.

Trial Court Opinion, 12/26/07, at 6 (footnotes omitted); *see also* N.T., 4/24/07 (afternoon), at 85.

¶ 12 Appellant and her husband initiated this lawsuit on July 1, 2004, within two years of July 9, 2002, the date on which the results of the WHI study became public, averring counts of negligence, fraud, breach of express warranty, loss of consortium, and a violation of corporate responsibilities. Wyeth and Upjohn filed motions for summary judgment asserting that the lawsuit was barred by the applicable statute of limitations and motions for compulsory non-suit contending that Appellant failed to show that her physicians would not have prescribed the medications even if adequate breast cancer warnings had been communicated before the results of the WHI study became public on July 9, 2002. R.R. at 143A–50A, 10,214A–221A, 10,226A–236A.

¶ 13 In denying the defendants' motions for summary judgment, the trial court determined that it was for the jury to decide, based on the relevant evidence, whether under the discovery rule a reasonable person would have recognized that breast cancer was caused by HRT before the results of the WHI study became public on July 9, 2002. The trial court further denied the defendants' motions for compulsory non-suit on the issue of proximate cause, holding that it was for the jury to decide whether adequate warnings would have prevented Appellant's doctors from prescribing HRT.

¶ 14 A five-week jury trial began on April 16, 2007. On May 15, 2007, the court instructed the jury to determine whether before the results of the WHI study were released, Appellant reasonably should have known that the hormone drugs she had taken had caused her breast cancer. The jury found that the discovery rule applied and that Appellant's lawsuit was timely.

It returned a verdict in favor of Appellant and against Upjohn in the amount of $1.5 million, rejected the claim for loss of consortium by Appellant's husband, and determined that co-defendant Wyeth was not liable for any damages. Appellant filed a timely post-trial motion seeking delay damages on May 23, 2007, and on May 25, 2007, Upjohn moved for JNOV on three grounds: 1) the suit was time-barred, 2) Appellant's physicians would have prescribed Provera even if Upjohn had adequately warned of the medication's breast cancer risk, and 3) Appellant's common law failure-to-warn tort claim was preempted by federal law.[6] In addition to requesting the entry of judgment notwithstanding the verdict, Upjohn also sought a new trial. The trial court heard argument on the parties' post-trial motions on September 5, 2007.

¶ 15 On September 7, 2007, the trial court denied Appellant's motion for delay damages, granted Upjohn's motion for judgment notwithstanding the verdict, and did not address Upjohn's request for a new trial. Appellant filed a notice of appeal on October 1, 2007, and Upjohn filed a cross-appeal on October 5, 2007, from the trial court's failure to rule on its motion for a new trial.

¶ 16 Appellant raises the following two issues in this appeal:

1. Did the trial court err as a matter of law in granting judgment notwithstanding the verdict in Upjohn's favor based on the supposed expiration of the statute of limitations, because Mrs. Simon did not sue Upjohn within two years of having been diagnosed with breast cancer, thereby impermissibly disregarding the jury's finding under the discovery rule, based on an abundance of evidence, that Mrs. Simon had sued Upjohn within two years of when it was reasonable for her to have recognized that consuming Upjohn's product had caused her breast cancer?

2. Did the trial court err as a matter of law in granting judgment notwithstanding the verdict in Upjohn's favor on the issue of proximate causation, where the jury found based on an abundance of evidence that Mrs. Simon would not have sustained breast cancer as a result of consuming Upjohn's product had Upjohn provided adequate warnings to Mrs. Simon's physicians of the breast cancer risks inherent in using that product?

Appellant's brief at 4.

¶ 17 We note our standard of review. "An appellate court will reverse a trial court's grant or denial of a JNOV only when the appellate court finds an abuse of discretion or an error of law." *Dooner v. DiDonato*, 971 A.2d 1187, 1193 (Pa.2009) (citing *Lockwood v. City of Pittsburgh*, 561 Pa. 515, 751 A.2d 1136, 1138 (2000)). "In reviewing the propriety of an order granting or denying judgment notwithstanding the verdict, we must determine whether there was sufficient competent evidence to sustain the verdict." *Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386, 787 A.2d 376, 383 (2001). We view the evidence in the light most favorable to the verdict winner, who must be given the benefit of every reasonable inference of fact. Any conflict in the evidence must be resolved in the verdict winner's

---

**6.** While Upjohn advanced the issue that federal preemption barred Appellant's claim as an alternative ground for affirmance, it withdrew that argument subsequent to oral argument in this Court in a letter filed on March 17, 2009.

favor. *Eichman v. McKeon,* 824 A.2d 305 (Pa.Super.2003).

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant.... [W]e must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm.... A JNOV should be entered only in a clear case.

*Griffin v. University of Pittsburgh Medical Center–Braddock Hosp.,* 950 A.2d 996, 999 (Pa.Super.2008) (quoting *Buckley v. Exodus Transit & Storage Corp.,* 744 A.2d 298, 304–305 (Pa.Super.1999)) (citations omitted). When the issue raised on appeal presents a question of law, our standard of review is *de novo* and our scope of review is plenary. *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.,* 982 A.2d 94, 97 (Pa.Super.2009) (citing *Dooner v. DiDonato, supra* ).

¶ 18 Appellant first contends that the trial court erred in granting JNOV based upon its conclusion that this action was barred by the two-year statute of limitations for personal injury claims. *See* 42 Pa.C.S. §§ 5502(a), 5524(2). In addressing this issue, we adhere to the following principles. Generally, a cause of action first accrues when a party is injured, and an action for personal injury must be filed within two years to satisfy the statute of limitations. 42 Pa.C.S. § 5524(2). Consequently, the statute of limitations herein commenced in May 2002,

when Appellant was diagnosed with breast cancer, absent an exception. The discovery rule is a judicially created exception that tolls the running of the applicable statute of limitations when an injury or its cause was not known or reasonably knowable. *Fine v. Checcio, D.D.S.,* 582 Pa. 253, 870 A.2d 850 (2005). The discovery rule can toll the statute of limitations until a plaintiff could reasonably discover the cause of his injury in cases where the connection between the injury and the conduct of another is not apparent. *Wilson v. El–Daief,* 600 Pa. 161, 964 A.2d 354 (2009).

¶ 19 If the injured party could not ascertain he was injured and by what cause within the limitations period, "despite the exercise of reasonable diligence," then the discovery rule is appropriate. *Pocono International Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983). The test is objective but takes into account individual capacities and society's expectations of "attention, knowledge, intelligence and judgment" for citizens to protect their own interests. *Fine, supra* at 858. The party who invokes the discovery rule has the burden of proving its applicability by establishing he acted with reasonable diligence in determining the fact and cause of his injury but he was unable to ascertain it. *Weik v. Estate of Brown,* 794 A.2d 907, 909 (Pa.Super.2002). Thus, the key point that gives rise to application of the discovery rule "is the inability of the injured party, despite the exercise of reasonable diligence, to know that he has been injured and by what cause." *Drelles v. Manufacturers Life Ins. Co.,* 881 A.2d 822, 831 (Pa.Super.2005) (citing *Fine, supra* at 858).

¶ 20 This determination is a factual one as to whether the party, despite the exercise of reasonable diligence, was unaware of his injury and unable to determine its cause. *Id.* Where the rule's ap-

plication involves a factual determination regarding whether the plaintiff exercised due diligence in discovering his injury, the jury must decide whether the rule applies. *Crouse v. Cyclops Industries,* 560 Pa. 394, 745 A.2d 606 (2000).

¶ 21 Appellant acknowledged that the injury became known to her when she was diagnosed with breast cancer on May 21, 2002. She notes that the jury was instructed to decide, based on the evidence presented,

whether a reasonable person in [Appellant's] position would have realized before the publicity surrounding the release of the results of the [WHI] study on July 9, 2002—establishing for the very first time a reliable causal link between combined hormone therapy medication and breast cancer—that defendants' hormone therapy medications were a cause of her breast cancer.

Appellant's brief at 23. Appellant maintained that from the time she began taking Provera through July 2002, the product information Upjohn distributed for the drug denied any causal link between progestins and breast cancer, and she had neither actual knowledge nor reason to know about the connection. Thus, she claims that it was not until July 9, 2002, when the results of the WHI study were released, that a reliable causal link between HRT and breast cancer was shown to exist.

¶ 22 Appellant explored her physicians' understanding of a relationship between HRT and breast cancer in the years before the release of the WHI study during videotaped depositions that were played for the jury. Dr. Dollinger was the first physician to prescribe HRT to Appellant. In response to the question, "[In 1992], [i]n a patient such as [Appellant], ... what would you have told her about the risk of cancer?", Dr. Dollinger replied, "I would have told her that as far as I knew, there was no increased risk of cancer. There is some association of breast discomfort." Dollinger deposition at 8; R.R. at 5011A. When asked when he learned of an increased risk of contracting breast cancer in relation to HRT, Dr. Dollinger stated, "It wasn't until the [WHI] study came out in, I believe it was 2002 that we became aware of the increased risk." Dollinger deposition at 4; R.R. at 5009A. Dr. Dollinger testified that he learned "of reports of a possibility that there was a link between hormone therapy and breast cancer" at the "same time the rest of the world heard it. I believe it was 2002, the world-held study." Dollinger deposition at 5; R.R. at 5010A.

¶ 23 Dr. Dollinger was shown the listing for Provera in the 1995 *Physicians' Desk Reference.* He testified that the boxed warning highlighted in the entry said nothing about a risk of breast cancer. Dollinger deposition at 13–14; R.R. at 5014A. Moreover, he acknowledged that in the section labeled "Dangers," the information set forth failed to note "any serious risk of breast cancer" and stated "nothing about the risk of breast cancer from combination therapy." Dollinger deposition at 14; R.R. at 5014A. He concluded that there was nothing in the Provera "label or any of the other pre Women's Health Initiative labels ... that alerted [him] ... to a serious risk of breast cancer from hormone therapy." *Id.*

¶ 24 Dr. Sladowski was Appellant's gynecologist beginning in 1998 and continuing until the time the cancer was diagnosed. Sladowski deposition at 10, 19; R.R. at 5043A, 5048A. She stated that Appellant was already taking Prempro when the physician began treating Appellant. Sladowski deposition at 11, R.R. at 5044A. Dr. Sladowski further explained that at the time she prescribed HRT, "I

didn't feel that the literature supported an increase in breast cancer." Sladowski deposition at 14, R.R. at 5045A. Dr. Sladowski was asked, "[K]nowing what we know now after WHI, are physicians like yourself conscious of the duration of combination hormone therapy and its potential risk of breast cancer and thus taking a more careful approach ... ?" Sladowski deposition at 45, R.R. at 5061A. Dr. Sladowski replied affirmatively, acknowledging it resulted from the information provided "after WHI." *Id.*

¶ 25 Dr. Somers, Appellant's gynecologist between Dr. Dollinger and Dr. Sladowski, had no recollection of treating Appellant and had no medical records regarding her. Dr. Somers offered contradictory testimony. When asked if publication of the WHI study changed her prescribing practices regarding HRT such that she "prescribe[s] it to the same extent [she] did previously," the physician responded, "I offered it to every patient in the exact same way." Somers deposition at 2–3, R.R. at 5064A–65A. Yet, she later admitted that after publication of the WHI study in 2002, her dialogue with patients changed. She explained,

[The dialogue] had to [change], because of the media blitz concerning the breast cancer risk, the purported increase in breast cancer risk with prolonged usage of hormone replacement, and that changed the discussion to a large degree, in terms of the details of that. We had to go over the Women's Health Initiative results and speak to patients and describe to them and inform them of the study and how it was done, and the conclusions that they arrived at, and so there was a lot of education that needed to be done concerning the Women's Health Initia-

tive, because it was exposed to the media, by the media.

Somers deposition at 10, R.R. at 5065A.

¶ 26 It is clear to us, based upon the evidence of record, that the jury reasonably found that Appellant's cause of action failed to accrue until the WHI study was published on July 9, 2002. Appellant had no reason even to suspect that there was a link between her use of HRT and breast cancer until the WHI report was released. Under the totality of circumstances, which included the facts that none of her prescribing physicians told her there was a causal link between HRT and breast cancer, and the product information for Provera was entirely dismissive of any such connection, Appellant was unaware of any causal connection between the HRT use and her breast cancer until after the publication of the WHI study.

¶ 27 It defies logic, contrary to the trial court's suggestion, that Appellant should have been aware of the risk of taking HRT through her own due diligence. It is entirely unreasonable that a lay person, completely lacking in medical training, would make the logical connection between HRT and breast cancer prior to the release of the WHI study, when three trained medical doctors believed that there was no such connection. The package insert for Provera completely denied any cancer connection to humans, suggesting only that the drug may be related to malignant mammary nodules in beagle dogs. Upjohn definitively advised that the significance of the findings regarding the beagles "with respect to humans has not been established." *Physicians' Desk Reference*, "Provera"; R.R. at 5231A.

¶ 28 In granting JNOV and overturning the jury's conclusion that Appellant was not aware of the cause of her injury until the WHI study was publicized, the trial court ascribes to Appellant a prior aware-

ness not only of a possible connection between HRT and breast cancer, but that a causal connection was probable. This jury certainly could conclude, and reasonably so, that if medical doctors did not appreciate the risk such that they undertook to warn their patients, it is improbable that a lay person would be cognizant of the connection. Thus, we find that there was sufficient competent evidence to sustain the jury's determination that Appellant's suit was not time-barred because she was unable to discover the cause of her injury after using reasonable diligence. Therefore, the trial court's grant of JNOV on the ground that the discovery rule exception to the statute of limitations does not apply is reversed.

¶ 29 We also address whether the trial court erred in granting JNOV on the ground that Upjohn's failure to warn of the increased risk of developing breast cancer associated with HRT was not a proximate cause of Appellant's injuries. In granting Upjohn's post-trial motion for JNOV on this alternate basis, the trial court relied upon its conclusion that Appellant failed to meet her burden of establishing proximate causation. The court determined that Appellant failed to prove that more complete labeling of the HRT medications to include a warning of the association between their use and breast cancer "would have altered the prescribing practices of the physicians and [Appellant's] use of the drug." Trial Court Opinion, 12/26/07, at 24 (footnote omitted).

¶ 30 Proximate cause is an essential element in failure-to-warn cases involving prescription medications. The law requires that "there must be some reasonable connection between the act or omission of the defendant and the injury suffered by the plaintiff." *Demmler v. SmithKline Beecham Corp.*, 448 Pa.Super. 425, 671 A.2d 1151, 1155 (1996) (citing

*Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 505 A.2d 973, 978 (1985)). In the duty to warn context, "plaintiffs must further establish proximate causation by showing that had defendant issued a proper warning to the learned intermediary, he would have altered his behavior and the injury would have been avoided." *Demmler v. SmithKline Beecham Corp.*, *supra* at 1155 (quoting *Mazur v. Merck & Co., Inc.*, 742 F.Supp. 239, 262 (E.D.Pa. 1990)).

¶ 31 Pennsylvania applies the learned intermediary doctrine to claims for failure to warn involving pharmaceutical drugs. *Lineberger v. Wyeth*, 894 A.2d 141 (Pa.Super.2006).

[T]he manufacturer of a prescription drug known to be dangerous for its intended use, has a duty to exercise reasonable care to inform those for whose use the article was supplied of the facts which make the product likely to be dangerous. However, the warnings which are required to be given by the manufacturer must be directed to the physician, not the patient-consumer. This is so because it is the duty of the prescribing physician to be fully aware of (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take the drug. The warnings which must accompany such drugs are directed to the physician rather than to the patient-consumer as it is for the prescribing physician to use his independent medical judgment, taking into account the data supplied to him from the manufacturer, other medical literature, and any other sources avail-

able to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug. Thus, in an action against a drug manufacturer based upon inadequate warnings, the issue to be determined is whether the warning, if any, that was given to the prescribing physicians was proper and adequate.

*Taurino v. Ellen,* 397 Pa.Super. 50, 579 A.2d 925, 927 (1990), *appeal denied,* 527 Pa. 603, 589 A.2d 693 (1991) (quoting *Makripodis by Makripodis v. Merrell–Dow Pharmaceuticals, Inc.,* 361 Pa.Super. 589, 523 A.2d 374, 378 (1987)). Appellant contends that the jury properly found, based on the evidence of record, that Appellant's doctors who prescribed Provera would not have done so if Upjohn had given the physicians adequate warnings. Upjohn counters that there is no evidence of record that Appellant's prescribing doctors read or relied upon Provera's label, nor did Appellant present testimony from her doctors that they would not have prescribed Provera to her if the warning had been different.

¶ 32 The trial court determined:

In light of the totality of evidence presented, this trial judge opines that Plaintiffs failed to prove proximate causation. Clearly, under the controlling case law, Defendants' duty to warn of any risks of the drugs was directly to Plaintiff-wife's treating physicians. In this trial judge's opinion, the labels of the drugs provided such warnings to the treating physicians, *albeit* not as extensive as Plaintiffs claim should have been done. The evidence of record also established that Plaintiff-wife's physicians had independent knowledge, prior to the release of the WHI report, that combined estrogen and progestin HRT posed an increase risk for a woman to develop breast cancer and, yet, did not hesitate to prescribe the HRT regimen.

Trial Court Opinion, 12/26/07, at 22–23.

¶ 33 Dr. Parisian testified at trial that Provera was not approved by the FDA in 1992, 1993, 1994, 1995, or 1996, the years Appellant took the drug, for use in hormone therapy for post-menopausal women. N.T., 4/19/07, at 65. She described a drug's use without FDA approval as "off-label use," meaning that "the FDA hasn't really signed off that it's safe and effective." *Id.* at 69. Appellant's counsel asked Dr. Parisian about Provera's use in combination with estrogen, inquiring, "[I]f neither of the manufacturers studied the two drugs being used together, then who would study it?" *Id.* at 71. The witness replied, "Well, no one would. Particularly, if you can get the doctors to prescribe it without having some kind of FDA approval." *Id.* Dr. Parisian later stated on cross-examination, "It's not the FDA's responsibility to study hormone replacement therapy. It's each manufacturer's product—every manufacturer's product is different, so the responsibility for the safety and effectiveness of each drug rests with the manufacturer, not with the FDA." N.T., 4/20/07 (afternoon), at 89; *see also* N.T., 4/19/07, at 71 ("[T]he pharmaceutical company [is] ultimately responsible for each of their own drugs ... to make sure that their product is safe and effective.").

¶ 34 Counsel also asked Dr. Parisian whether Upjohn did any study prior to 1996, when Appellant stopped using Provera, that carefully considered the proper dosage of estrogen and Provera for use in post-menopausal women. The witness responded:

A. Not carefully considered ... [T]he dosage regimen never was really honed in as to what was the proper dosage for this treatment for women for menopause.

Q. And is it important for the doctor to know exactly what the right dosing regimen might be for a pharmaceutical product?

A. Well, for any pharmaceutical, the dosing is important. I mean, this is an unapproved use and there is no real information—there's been no studies done, there's been no approval by FDA to say anything about a dosage regimen; so the physicians aren't being given that information.

Q. And whose responsibility is it to notify the physicians?

A. Well, it would be the company's, I mean, they should have notified—they should have had this approved by the FDA, but if you're marketing unapproved, the physicians need to know what the risks are and how to write a prescription for it; but when you start writing a prescription, the cart is ahead of the horse, really.

*Id.* at 83–84.

¶ 35 Dr. Parisian provided extensive testimony regarding Upjohn's use of the beagle dog "warning" and the labeling of Provera beginning in 1981 through the time Appellant took the drug, as follows:

By [Appellant]:

Q. From the standpoint of labeling at the Food & Drug Administration, based on your history and experience and knowledge of proper warnings and labels, is there anything in the text that is right in front of you from 1981 concerning beagle dogs that would be a fair indication to physicians that their product caused breast cancer in female women?

A. No.

. . . .

No, that wouldn't convey that information.

Q. Is there anything in the beagle dog warning that would indicate to physicians that the use of [Provera] in combination with Premarin in postmenopausal women would cause breast cancer in women?

. . . .

A. No, there's nothing there that mentions use with estrogen.

Q. Is there anything in number 2, the beagle dog warning, that would be a fair indication to physicians that any particular dosage or duration of [Provera] and Premarin would cause breast cancer in women?

A. No.

Q. Is this labeling from 1981 the exact same labeling that existed in 1996 on the last date that [Appellant] took the combination Provera?

A. Yes.

Q. During the intervening years from 1981 all the way up to 1996, those 15 years, did this warning label ever change?

A. No.

Q. Was there ever any other additional warning label that was provided with [Provera] somewhere else in the label that told women that the use of the combination product could cause breast cancer to them?

A. No.

. . . .

Q. What is the heading for section number 3 in the 1981 label that you have in front of you?

A. Contraindications.

Q. And would you read number 3 exactly to the jury?

A. Known or suspected malignancy of breast or genital organs.

Q. Now, when we say contraindications, and let me be perfectly clear,

in the FDA's approved labeling when they state contraindications, what does that mean?

A. That means that the risk is too great in terms of the benefit, so you wouldn't use it. Contraindicated would mean that that is a product you don't use for that person, just, period.

Q. So if a lady had breast cancer and she went to her physician and her physician consulted the Physicians Desk Reference that has all the product labels in it, it's about that thick, and he looked down at contraindications, what would this label tell him?

A. That if that woman has known malignancy, whether in her breasts or her genital organs, that you don't use this product for her.

. . . .

Q. Now, is the contraindication section supposed to advise the doctor that, hey, also, by the way, we think this causes breast cancer in women who start taking it?

A. Well, that's not what that does. You would put that in the warning. You could put it in the contraindications if you had it. But you would at least put that in the warnings.

. . . .

Q. As far as this particular section is concerned, does it provide the physician with any type of fair warning that the use of [Provera] in combination with estrogen products can cause breast cancer in women in the future?

A. No.

N.T., 4/19/07 (afternoon), at 105–109; *see also id.* at 44–45 (medroxyprogesterone acetate is progestin Provera). Dr. Parisian's testimony established that Upjohn

unsuccessfully sought approval by the FDA for Provera's use with estrogen in treating post-menopausal women through 1996 and beyond, when Appellant's doctors prescribed Prempro to her. It further elucidated that Upjohn failed to conduct sufficient long-term studies to support the use of Provera in combination with estrogen in the treatment of post-menopausal women. Despite the non-approval of Provera by the FDA during the years Appellant took the drug, Upjohn marketed the product to physicians with accompanying labels that failed to put the doctors on notice that the studies establishing Provera's safety and intended use had not been done. The following testimony is telling:

Q. We've seen these documents from '83 to '90. If UpJohn had information that it developed between '59 when [Provera] first came on the market and 1983 when they first started getting these letters from the FDA, could they have furnished that data to the FDA?

A. Yes. And they could have conducted clinical trials and they could have provided any of that information at any time to the FDA.

Q. As of 1990, have you drawn any conclusions and do you have any opinions about whether or not UpJohn had developed the adequate information to get [Provera] approved for combination usage?

A. Well, they had not. That's why it kept getting rejected. There were no independent clinical trials to specifically go after this new indication.

Q. As of 1990, do you have an opinion as to whether or not UpJohn had developed any data as to whether or not [Provera] used with estrogen at the same time would cause breast cancer in women?

. . . .

A. I haven't seen any studies where they were looking at that.

Q. And, in fact, the studies that they cited to the FDA, were they of substantial quality and protocol and design to satisfy the federal government that the issue had been looked at properly?

A. No.

Q. As of 1990, did they have notice that the FDA wanted them to do that, if this product was going to continue to be used in combination with estrogen?

A. Yes.

N.T., 4/20/07 (morning), at 56–57.

¶ 36 The testimony the trial court offered in support of its conclusion that Dr. Dollinger had independent knowledge prior to the release of the WHI study "that combined estrogen and progestin HRT posed a risk for a woman to develop breast cancer," in our view actually supports the contrary conclusion. *See id.* at 23. The portion of the testimony cited by the trial court reveals that Dr. Dollinger, who was the only treating gynecologist who remembered Appellant, 1) denied there was a controversy in the 1990s concerning whether HRT could cause breast cancer; 2) the general "consensus" was that "it did not"; 3) **he was not aware of a possible association in the published literature between HRT and breast cancer;** and in fact, 4) "I would say that there was never really proven to be an association." Dollinger deposition at 11; R.R. at 5013A (emphasis added).

¶ 37 As noted *supra,* Appellant testified that Dr. Dollinger first prescribed Premarin and Provera, Upjohn's products, fol-lowed by Prempro. Thus, Appellant believed that by the time she was treated by Dr. Somers, she was already on Prempro, which was manufactured by Wyeth and was not Upjohn's product. N.T., 4/24/07 (afternoon), at 52. Dr. Dollinger, however, testified that he retired in 1994, which was before Prempro was released. Thus, Dr. Somers may also have prescribed Provera for Appellant.[7]

¶ 38 Contrary to Upjohn's assertion, the instant case is not similar to *Lineberger v. Wyeth, supra,* where the certified record included evidence that a different warning would not have altered the prescribing physician's actions. In *Lineberger,* the physician specifically testified that even if the drug's literature had included a specific warning, he still would have prescribed the drug in question.

¶ 39 Our review of the record in the case *sub judice* compels our conclusion that the evidence proffered at trial was sufficient to allow the jury to conclude that Upjohn "negligently fail[ed] to provide adequate warnings of the risks of breast cancer to [Appellant's] prescribing physicians during the time she took ... Provera...." Jury verdict form; R.R. at 10390A; N.T., 5/15/07, at 90. Dr. Parisian's testimony underscores Upjohn's lack of studies to support its marketing of Provera.

Q. [By Appellant] Now, do you have an opinion based on your review of the UpJohn documents, based on your training and years of experience in the FDA process as to whether or not UpJohn was reasonable in its supplying of Provera to post-menopausal women from the standpoint of safety?

A. Yes, I have an opinion.

---

7. Dr. Somers did not recall Appellant and had no medical records relating to her. Somers deposition at 3, R.R. at 5065A. Dr. Sladowski also had no recollection of Appellant but did have some medical records regarding Appellant's care. Sladowski deposition at 1, 10; R.R. at 5039A, 5043A.

Q. And what is your opinion?

A. My opinion was that they were not reasonable. This is an old drug that had gotten in before the—in the DESI Program. There were no clinical trials to address the drug. A lot of the efficacy claims came from paper review by the FDA.

They began to market the drug for post-menopausal women. At the time they did that, they should have done studies to see that it was safe and effective to begin that new indication for use. They didn't do that. They continuously were reminded that they were not doing that by the FDA.

They were denied approvals. Yet, they promoted it to physicians. Physicians began using the product before the FDA's mechanism for safety and effectiveness reviews had really broken in.

So you have a lot of physicians that were used to the old FDA. You have a drug. You can use it. So the physicians had been trained to use it. **They [Upjohn] marketed it to the physicians rather than doing the clinical trials that they needed to do to actually get it approved and show that it was safe and effective.** And the situation at the FDA allowed that to happen, unfortunately; but it did occur.

**And physicians were not being told that the studies weren't being done.** They were given reprints saying it's safe, given marketing saying it's safe. **So the physicians were not aware that there was no study done to look at the safety of giving this drug as a combination therapy or alone to women who are menopausal.**

. . . .

Q. Was that true during the years 1992 to 1996 while [Appellant] took this product?

A. Yes.

. . . .

Q. What would a properly labeled warning had told women had Up-John conducted the appropriate studies?

. . . .

A. A properly done label up to 1996 would have made mention of the signals that were occurring in the medical literature about this increased risk of breast cancer. There would have been studies to have been done and a properly written label to support that it was safe and effective to begin the use of this product in a new population.

So there is no information. Since the approved label never had this indication at the time period we are talking about, it really doesn't address menopausal women at all. It addresses the use of this product in premenopausal women like we were showing yesterday for control of menstruation.

There is nothing in the label that addresses the use of this product for this population. There is also no information about the dosing in terms of should you give this drug to women continuously or should you give it to them sequentially trying to make it look like their own period. There is no dosing information as to the proper and safe use of this product, it's never been developed.

So we're missing breast cancer risk. We're missing dosing information. We're missing information for the physician to know how to prescribe it to women.

The FDA has been saying if you use hormonal products, it should be for the shortest period of time possible. We have promotion of this product for an extended period of time. The promotion is that you are going to keep these

women on this product forever. You know, they've hit menopause. So you are going to keep them on this drug for the rest of their lives to keep them glamorous grandmothers. So the whole thing is the labeling just doesn't reflect the use at all.

. . . .

Q. What opinion do you have about whether or not it should have carried a black-box warning, since breast cancer is involved?

A. Yes, it should. And I think—it should cause that's—in terms of a physician's and a patient's risk versus benefit decision, does the woman want to control her hormonal symptoms with menopause in knowing that there is an increased risk of breast cancer? Let her make a decision. Let the physician make a decision.

The black box actually calls their attention to it so that they can make an informed decision. Is this a patient that needs to be on this product and is the risk versus benefit enough to justify the risk of breast cancer? Which is the greater concern to that woman at that time to the physician?

So that information needs to have the attention called to it. And that's what the black-box does. It calls attention that there is this warning, there is this risk. And if a physician and a patient decide to use short-term use, let them put that into their own mind as to you know, what kind of precautions need to be taken so that she is safe.

. . . .

Q. Do you have an opinion as to whether or not the proper label would state anything with regard to a specific duration of use?

A. Yes. I think that there should be clinical trials done and they should

have been determined in terms of the length of time.

And, you know, no dosing was ever done, studies to actually determine which is the safest regimen. We have a product here, [Provera], that's much stronger than progesterone. So those types of studies should have been done. How long is safe for this indication? Those studies aren't done yet, and they weren't done before 1996.

N.T., 4/20/07 (morning), at 92–98 (emphasis added).

¶ 40 Dr. Dollinger testified that while he continues to prescribe HRT to menopausal women, his practices have changed since the WHI study. Before 2002, Dr. Dollinger "never warned patients about" the risk of breast cancer and "never took them off the hormone therapy because of it." Dollinger deposition at 5; R.R. at 5010A. After the study came out, he "took every single patient off of the pill . . . the combination pill." *Id.* Moreover, while he continues to prescribe HRT, he does so only "as long as I tell the patient about the warnings about the [WHI] study." Dollinger deposition at 9; R.R. at 5012A. He does not prescribe Premarin and Provera in combination; he either prescribes Premarin alone for women without a uterus, or he prescribes Prempro. Dollinger deposition at 11; R.R. at 5013A.

¶ 41 Moreover, when asked if he would have prescribed HRT to Appellant in 1992 if he had the information from the WHI study, Dr. Dollinger stated:

I would have had a long discussion with her about how bad her symptoms were. I would tell her about the study. I would try to interpret the study for her.

The decision would be hers, not mine. She would have to weigh the risks . . . . I would have no qualms about it, but I

would still have to warn somebody about the study, which, by the way, is what I do now.

Dollinger deposition at 10–11; R.R. at 5012A–5013A. Similarly, both Dr. Somers and Dr. Sladowski testified that the discussions they now have with patients has changed since the dissemination of the WHI study. Somers deposition at 10; R.R. at 5065A; Sladowski deposition at 45; R.R. at 5061A. Dr. Sladowski stated that if she had the information provided by the WHI study at the time Appellant had been her patient, she would have provided it to Appellant "in terms of deciding whether or not she should continue to use" it. Sladowski deposition at 35–36, R.R. at 5056A. The trial court is simply wrong that Appellant did not prove that "a more complete labeling of … Provera … would have altered the prescribing practices of the physicians and [Appellant's] use of the drug." Trial Court Opinion, 12/26/07, at 24. Appellant testified that if she had been warned of the increased risk in developing breast cancer by taking HRT, she would not have taken the hormones. N.T., 4/24/07 (afternoon), at 90.

¶ 42 The evidence of causation in the instant case is similar to that presented in the recently affirmed decision by the Eighth Circuit Court of Appeals in *In re Prempro Products Liability Litigation,* 586 F.3d 547 (8th Cir.2009). There, the court of appeals noted that although conflicting, "the evidence on proximate causation was sufficient to allow the jury to find that a failure to warn was the proximate cause" of the appellant's injuries. *Id.,* 586 F.3d at 569. The appellant's prescribing physician testified "that he still prescribes estrogen plus progestin to menopausal women," but "his prescription practices for these drugs have changed since the WHI study" in that he writes few prescriptions for HRT and maintains patients on the medications for less than five years. *Id.*

The court of appeals found that "the jury could reasonably [have] conclude[d] that had Wyeth and Upjohn adequately warned of the breast cancer risk," the appellant would have been among the prescribing doctor's patients "who do not take hormone replacement therapy drugs or among those who take them for a shorter period of time." *Id.*

¶ 43 Similarly, the prescribing physician therein, as represented instantly by Drs. Dollinger, Somers, and Sladowski, "testified that he would respect a patient's wishes and not prescribe hormone replacement therapy if she was concerned about the risk of breast cancer. Thus, the jury could have concluded that [the appellant] would have chosen not to take the drugs if the warnings had been adequate." *Id.* The court of appeals underscored that "[t]he current labels do not simply identify the 1.24 relative risk reported from the WHI study, but also include a boxed warning, with straightforward language, and devote substantial attention to the risk of breast cancer." *Id.*

¶ 44 In the case at bar, the jury obviously believed the testimony of Appellant's doctors that they would have permitted Appellant to decide, based on the cancer risk that the WHI study revealed, whether to accept prescriptions for HRT. The jury also apparently believed Appellant's testimony that based on the WHI study findings, she would not have utilized HRT once her doctors communicated the information they presently share with patients regarding breast cancer risk. We reject outright Upjohn's suggestion that Appellant had no difficulty understanding there was a risk to taking HRT. Upjohn's brief at 32. Upjohn's alleged support for this assertion concerns testimony relating to the drug Prempro, not Provera. N.T., 4/25/07 (morning), at 70. More important-

ly, however, Appellant definitively testified that while she read package inserts for drugs prescribed for her, "half the time I can't understand what they're saying, but I tried to read them." N.T., 4/24/07 (afternoon), at 119. Upjohn's suggestion that Appellant appreciated the cancer risk ascribes greater understanding to her than was exhibited by trained medical personnel, her physicians. That claim is specious. On appeal, Upjohn makes all of the same arguments regarding causation that it made to the jury, and the jury found in favor of Appellant. Accordingly, based on the evidence, the jury permissibly found that Appellant's physicians would not have prescribed Provera to her if adequate warnings had been provided by Upjohn, as became available once the results of the WHI study were released. Clearly, the jury reasonably concluded that if Upjohn had adequately warned of the breast cancer risk, Appellant could have been among Dr. Dollinger's patients who would not have taken hormone replacement drugs.

¶ 45 Viewing the evidence in the light most favorable to Appellant as the verdict winner and giving her the benefit of every reasonable inference of fact, as we must, there was sufficient competent evidence to sustain the verdict. Therefore, we conclude that the trial court also erred in granting JNOV on the ground that Appellant did not sustain her burden of proving proximate causation, and we vacate that order. We remand this matter to the trial court to consider the issues advanced by Upjohn in its motion for a new trial, and direct the trial court to file its opinion within sixty days from the date this Opinion is filed.

¶ 46 Order granting judgment notwithstanding the verdict vacated. Jury verdict reinstated. Case remanded for preparation of trial court opinion addressing Upjohn's motion for a new trial. Panel jurisdiction retained.